TESTESTOR MASTER VALUE FUND LP v. REPUBLIC OF ARGENTINA Mr. Lucuzzi, will you read? Thank you, Your Honor, and may it please the Court. Carmine Lucuzzi on behalf of the appellant, the Republic of Argentina. The District Court committed error in granting the orders of attachment and turnover with respect to the reversionary interest in the U.S.D. and D.M.K. Brady collateral. What is attached and is ordered to be turnover is the reversionary interest of Argentina in certain collateral accounts in the corresponding collateral. The District Court, and I think it was common ground and it is common ground among the parties, was not attaching and could not attach the collateral itself. That's the zero-coupon bond issued by the United States Treasury some 30 years ago. Once that bond was pledged, the Federal Reserve Bank of New York became the legal owner. The Brady bondholders had the senior lead, and so for a third-party creditor to come in, they had to wait until there was actually some attachable interest of the Republic for them to go to. That would only happen upon the service of a notice of full payment reflected in Schedule K to the collateral pledge agreement, and that notice of full payment says that the money is to be sent to an account of the Central Bank of Argentina. The Central Bank of Argentina is an entity separate from the Republic and not liable for its debts. The Court below gave very little attention or concern about that language, saying because the language says it's to be substantially similar language, that that could be ignored. But that's not what's happening here. The language referencing the BCRA is not in brackets, as is other language in that form. That form of notice is different from Schedule F-2, which is used in this case. As a practical matter, so if these funds were deposited in the BCRA, could they spend it in any way that they choose? There's no sort of connection or Argentina, the Republic, would not have the ability to direct them as to the use of those funds? It just becomes part of the fungible mass called the International Reserves of the Central Bank. And Your Honor raises a good question. Could there then be a possibility that the Republic of Argentina could, quote, use the money? But that gets to the second problem with these injunctions, I'm sorry, the attachment and the turnover, which is that's a separate requirement of the Foreign Sovereign Immunities Act. It was their burden to show that the money was being used for, and the reversionary interest was being used for a commercial activity in the United States. Money landing in the account of the BCRA is not used for a commercial activity in the United States. And here I would point, Your Honor, to this Court's decision in the Aurelius case in 2009. In that case, you had money being invested by private pension fund administrators in the United States to fulfill Argentine pension obligations. The Republic of Argentina passed legislation saying that money is now the property of ANSES, which for purposes of the decision that this Court issued was understood to be the Republic. And so the plaintiffs ran in. They attached it. They said this money is scheduled to go to the Republic of Argentina. This Court vacated those attachments, saying there was no opportunity for use in the United States. It was just a transfer of funds or an order that funds be transferred. So here, whether the funds were going to an account of the BCRA at the Federal Reserve Bank of New York or an account of Argentina there, though Argentina does not have an account there, there is still an additional hurdle that they failed to show that these funds are being used for a commercial activity here. Why isn't that shown by tracing back to the origin of those funds, how those funds came to be, simply by conversion from the collateral that had been supplied by the Brady formulation in order to enable Argentina to make a commercial borrowing, to go onto the market and offer bonds that people will buy because they've been backed up by collateral. But again, what was attached, Judge LaValle, was not the collateral but our reversionary interest, the ability to get the collateral. It's not even the collateral anymore. At that point, it's not being used as collateral. It's excess that only exists. No, but it came to be as excess collateral because it was put up as collateral. And you're saying that all that prior history disappears when the bonds are liquidated and become cash and are paid into the central bank or available to be paid to the central bank of Argentina. But that kind of seems to me to be just closing one's eyes to what has been the history of the transaction and what was the origin of these funds. How did they come into being? But, Your Honor, I think the full transaction, of course, was in the Brady program, which is only available to sovereigns. That was a zero-coupon bond issued pursuant to that program in the MOU, an intergovernmental agreement between Argentina and the United States government. It was paid for with reserve money and money from multilateral institutions like the IMF. So purely something different from your typical garden variety transaction. This was that zero-coupon bond, which was purchased with reserves, was something that only a sovereign state could have done. And then when it's there, that's not what they're attaching. And so I don't think we simply look at the fact that the bond was used as security, the zero-coupon bond for the obligations of the Brady bond holders. I think you have to look at what was purported to be attached here because that's all they could attach, which is when they're not collateral anymore, when they're not being used for that purpose and they're going to the central bank, is that used by the Republic of Argentina for a commercial activity in the United States? So what would you have us say about our prior CBI decisions? I mean, it seems we've already decided or foreclosed most of the issues you're raising right now. So how would you write an opinion for us? I think to say that these issues are foreclosed would basically be applying the doctrine of offensive collateral estoppel against the Republic. That was raised below. Judge Preska did not accept that. They're not challenging that on appeal. She didn't address it. Excuse me? She said she wasn't addressing it. She said, I don't need to. And this gets to the other point. She says, I don't need to because in the context of the FSAA, you have to measure whether it's attachable at each time you impose process. So here, this attachment happened in 2021. At that point, you had to do an analysis of the issues. So this is a new argument. You literally could have raised this argument 20 years ago, right? I guess it's possible, but I would have to say one thing. Of course, it was a separate plaintiff, different plaintiff. It was in the context of an exchange offer where the relevant provision was Section 6.01. We weren't even talking about maturity. The issue there was really whether they were entitled to a second-in-time lien given the existence of the seniors and whether the fact that there might not be anything in 2023 meant the judge below had the discretion just to deny it. That was the fight in this court and the fight below. Well, why don't you finish the answer to the first part of that? You started with offensive collateral estoppel. So as to offensive collateral estoppel, they raised that below. Judge Prescott decided the issues on the merits. It clearly isn't applicable. We didn't have a final judgment in that case. And the other factors that are relevant don't apply. And it clearly was an abuse of discretion by Judge Prescott not to apply the doctrine of offensive collateral estoppel. So I think then really the question becomes is there's a footnote, footnote 4, I think, in CVI 1, which references this is an attachable interest to the Republic. I don't think, given that these issues were raised as a matter of this court's precedent, that all these other issues now just are deemed decided in that footnote reference there. So I think all these arguments were ---- Well, the alternative is to say that those other decisions were just completely off base because this was a new argument that was raised. I don't think we need to say those decisions were off base because those decisions ---- I mean, I'm not sure what you're asking us to say about them. That's my concern. I think the point was it's, for example, if a defendant didn't raise personal jurisdiction against one party and then another suit comes along and they raise a personal jurisdiction defense, that's appropriate. Here the argument about use for commercial activity wasn't used when one was ---- and, again, this was 2005, 18 years before maturity, as opposed to when you get to the eve of maturity. You're talking about that specific context. And also we were before the Aurelius decision, which is an important decision for this use for argument. That hadn't even been decided yet by this court. And so I think all those factors show that I don't think there's any binding there or limitation for what this court can do or this court has to say that it was wrongheaded or did something wrong back then. Okay. Thank you, counsel. You've preserved a few minutes for rebuttal. Thank you. Mr. Bash. Thank you, Judge Parkin. And may it please the court, John Bash for the plaintiff's appellee's urging affirmance of all the orders under review in this case. I'd like to briefly respond to some of my friend's comments about the BICRA central bank issue and then hopefully have an opportunity to talk about commercial use and CITUS. Judge Park, on BICRA, you're correct. Their position is foreclosed by precedent. And I think what's important to understand is that this is not a question of an implied holding. It's the express holding of both CBI 1 and CBI 3, which was after the Aurelius decision, that the reversionary interest belongs to Argentina. That's a premise of the holding, and it's stated expressly. Because, remember, the court ordered an attachment of the reversionary interest, which could not have happened if it did not belong to Argentina. That part's express, but what about the FSIA part? The FSIA part, Judge Park, is not express. That is an implied jurisdictional holding, and this court I think has treated implied jurisdictional holdings differently in different cases. And I guess I should mention there's a question about whether 1610 truly is jurisdictional. So we have not primarily relied on stare decisis for the commercial use FSIA-specific issues. But on the first issue, BICRA, this court did hold that the reversionary interest belongs to Argentina.  We're not scared of the merits of that. The operative text of the CPA says half a dozen times, shall revert to Argentina. It discusses BICRA in other ways for other purposes. It never says that it shall revert to BICRA. They're basing their argument on a form document in a schedule. But that is incorporated into the agreement in a specific way. The definitional provision of notice of full payment says, use a document substantially in the form of that form document. And what we submit is if you change one word specifically in order to conform the form document to the operative text of the agreement, it's still substantially in the form. So if I could, I'd like to turn to commercial use, which is the second issue in the briefs. Here's the rule we would urge the court to adopt, which I think is the narrowest path to affirmance on this issue. We know that a contractual interest can be a property right under the FSIA because 1610A5 makes that clear. And we would urge the court to hold this. When a contractual interest is embedded in a broader commercial relationship, in a way that changes the character of that relationship, for example, by giving the sovereign more flexibility and options in what it can do vis-a-vis the other parties to that ongoing relationship, that is sufficient for commercial use of the contract interest. In this case, here's how that rule applies. As Judge LaValle, your concurrence in the CDI 3 case made clear. By holding this reversionary interest in the collateral, Argentina has considerably more options throughout the life of the debt for how to retire the debt. It doesn't just have to wait until maturity, cash out the zero-coupon bonds and pay the proceeds. As Judge LaValle said, Argentina can say, you know what, will you take a share of Argentine grain production in lieu of the proceeds, and will you do that 15 years before maturity? Can I just ask you, the things that you were talking about in some ways sound to me like the kind of options that you are always given when you have cash or a promise of cash. And so I'm just, I'm trying to figure out what the limits are with this type of situation and calling it commercial activity, because I understand if you have cash, yes, it does give you options. But how does that, what's the scenario where money or an interest of this kind in a bank would not constitute commercial activity? Judge Lee, let me give you what I think is a common and classic limiting principle, in other words, the case where under our rule it would not be used for commercial activity. Suppose that Argentina just sold a piece of land and had a contractual right to payment on the sale. That's it. There's no, it's not embedded in some ongoing relationship. It's just a pure right to payment on the sale of land. Under our rule, while that contractual right to payment would have been generated through a commercial activity, it's not being used in a commercial activity. It's just sitting out there. Now, in contrast, if Argentina said we're going to pledge that right to payment as collateral for a loan from a bank, now it's being used for commercial activity. And that's the example that the Fifth Circuit gave in Connecticut Bank. So taking it back to the facts of this case, we're not saying just because Argentina may get some money at maturity or upon a triggering event that's used for a commercial activity. What we are saying is that the fact that this right is part of this broader relationship gives Argentina options in its strategic planning for how to retire the debt. And that's not theoretical. Argentina, you've invoked that reversionary interest. Do you think that use is ongoing and continuous, or is it discrete? It's used at certain times when something is restructured or interest payment is made. Judge Park, we think it's ongoing and continuous, but we also think that even if the court sees the prior exchange offers as two discrete instances of its invocation, we should still prevail. So I think I've described why we think it's ongoing, because Argentina constantly has that interest in the background when it's making strategic decisions about this debt. It knows next year it can offer an exchange. But even if the court disagrees with that and thinks that's not the right way to think about this, we'll note that every circuit case that has looked at the commercial use question, especially in the context of intangible rights, has said it doesn't have to be that the intangible right is being invoked right at the moment of attachment. You could basically never attach an intangible right if that was true. It's enough to look at the past and look at the character of the right and how it's been used in the past to judge. And that's consistent with this court's standard in Aurelius that my colleague invoked, because that doesn't say is used at the time of attachment. It says must have been used in the present perfect at the time of attachment. And it's also consistent with this court's holding in the NML case from 2012, where the court held that a bank account that had been used in the past for the purchase of scientific equipment was used for commercial activity. Now, as far as I know, the order of attachment wasn't issued mid-transaction, mid-purchase. The court looked at the past character of the account. And just to bring it back to the facts here, I know my colleagues in their final reply brief have an argument that the reversionary interest was not necessary or invoked in the 2005 exchange and the 2010 exchange offer. That has to be wrong. And the reason the court has to know that's wrong is there never would have been a CBI 1 or CBI 3 if that was true. Remember, the whole premise of CBI 3 is that the preexisting attachment of the reversionary interest blocked the 2010 exchange. And this court said that's okay. It's a preexisting attachment, and if it blocks the exchange, so be it. I'm sorry to interrupt. Can you explain how that theory of use applies to the Deutschmark collateral? Is it the same in Europe? It could be anywhere around the world. The theory is the same. And the reason is that the site... Well, it has to be in the U.S. I mean, so I guess it brings that piece of it into play. It has to be in the United States. So what my friends have said is that 1610A imposes two requirements. The property must be in the United States, and it must be used for commercial activity in the United States. Now, on whether it's in the United States, we've given the court the CITUS analysis. I'm happy to talk about that in detail. But the bottom line is that because the party with the obligation to perform is in the United States, the CITUS of that contractual right was always in the United States. And that's the Federal Reserve Bank of New York, because they have the obligation to turn over the proceeds when the reversionary interest is triggered. Now, my friends have said, well, okay, fine, even if you're right about that, it's not used for commercial activity in the United States. We have no objection to the notion that those are different requirements. And it may be, for example, if an airplane had been used for commercial activity in Argentina and then suddenly brought into the United States, it is in the United States, but it was not used for commercial activity in the United States. But in a case like this one, where the CITUS of the intangible property has at all relevant times been in the United States, then just as a matter of plain English, if it was used for commercial activity, as we submit in the other argument, then it necessarily was used for a commercial activity in the United States. Now, what my friend would have the court say is, no, you should look at, in some sense, the primary locus of the commercial activities and for the German interest, that's in Germany. That's not correct. When the FSIA wants the court to focus on the locus of the commercial activity, it uses a different phrase. It says commercial activity carried on in the United States. And that's a defined term that requires substantial contact. This uses a different phrase. It's the phrasal adjective in the D.C. Circuit's words, used for a commercial activity in the United States. The focus is on where the interest was used. And our submission is that if it's CITUS at all relevant times was in the United States while it was being used for a commercial activity, then as a matter of plain English, it was used for a commercial activity. Now, I'd like to make one more point about how even under their rule we would win on this position, but I see my time's expired, so I wonder if I could add that point. So even if it were true that the court in this case, with respect to the DMK reversionary interest, needed to focus on where the commercial activities took place. Remember, we say the reversionary interest facilitates exchanges and other ways to retire debt. The 2005 and 2010 exchanges were targeted specifically to U.S. investors through an SEC prospectus. And the proposed 2010 exchange, which was blocked by this court, would have had a U.S. custodian liquidating the proceeds and paying the cash and issuing new debt traded on a U.S. exchange. All of that is more than sufficient for commercial activity in the United States. And if there are no further questions, we'd respectfully ask the court. Just one question. Could you speak to the issue of whether or not the Republic is acting, whether or not this qualifies as commercial activity based on the idea that this was not sort of a garden variety that was uniquely acting as a sovereign as a result of the participation in this Brady plan? Yes, Judge Lee. So there's no question that the Brady bonds are garden variety debt within the meaning of the Weltover decision by the Supreme Court. They're traded in an ordinary market. They're enforceable in courts like this. They're ordinary commercial debt. What Argentina is saying is let's go a few steps back. And we never could have gotten the zero-coupon collateral if we hadn't gotten a loan from the IMF and other international institutions. And this court said in EM1 in 2017 that IMF loans are sovereign. Here's what's wrong with that. The fact that the collateral, much less the reversionary interest, which is even another step away, was acquired in some sense or arguably through sovereign activity, couldn't affect how it's being used now. And here's the example that shows why that's true and that Argentina just doesn't even respond to in the brief. Suppose that Argentina used its eminent domain power to seize aircraft, let's say. Classic sovereign activity. But then it put the aircraft up as collateral for a loan. Well, just because it acquired the aircraft through the eminent domain power does not mean it's not now being used for commercial activity or it uses the aircraft in a commercial enterprise. So it's almost the flip side of the rule that my friends have invoked. Just like the fact that an interest was generated through commercial activity doesn't mean its use is necessary commercial. The mirror image principle applies. The fact that they may have in some sense acquired the reversionary interest if you trace back three or four steps from sovereign activity does not mean that it's now being used for sovereign activity when it's embedded in this ordinary garden variety commercial arrangement. Thank you, counsel. Thank you. We'll hear about it. Thank you. Just to reply to some of my colleague's points. First, to correct, this was a special program available only to sovereigns. But he fell back and he said the collateral then was used for commercial activity. But the collateral is not what is the subject of the attachment. He couldn't have attached that. Even under basic New York law principles, something has to be transferable or assignable. By the terms of the MOU, the zero coupon bond was not transferable or assignable. So then that gets us to the reversionary, the right to get money when all is done. It is not being used as collateral anymore. And there, there is just no use of that. And we heard repeatedly about the use of the reversionary interest. But the reversionary interest was never used by the republic over the life of it. To do the 2005 exchange, we had to put into effect what is called the continuation agreement. The continuation agreement made explicitly clear that the possibility of the lien lifting under section 601 of the CPA would not come into play. That is, there would be no reversionary interest in the republic. The lien would stay in the Brady bond holders. So they could take back their collateral in satisfaction of the obligations owed to them. In 2011, again, the point was we didn't want to use the reversionary interest. The point was that the Brady bond holders wanted to come in. But the court said, well, we've got a preexisting attachment. That can't happen. And so, again, ironically, because there have been attachments all these years, there's been no use. But potential use, everything can be used for a commercial activity. But that's not the test. The test is, is the republic, I would say, is the republic looking at what's going on now, a transfer of funds to the Central Bank of Argentina's account at the Fed, is that commercial activity? Under the case by the republic, under the case law, Aurelius, and I would also ask your honors to look at the Fifth Circuit case, my adversary mentioned those as well, the Connecticut Bank of Commerce case, the AFCAP case, those cases involved the Republic of Congo in joint ventures with Texas oil producers. Under those contracts, so we had agreements, they had the right to receive royalties, taxes, bonuses. The Fifth Circuit, and these cases are cited by this court, in Aurelius, in EM, the Fifth Circuit said it's not enough that some commercial relationship is generating funds that are going to the Congo. The question is how is the Congo using it? And so again- So your argument right now is just a continuous use. What about your friend's arguments about, you know, prior uses? Well, that was my point about there was no use. The collateral was there for the Brady Bond holders. He's not attaching the collateral. He's saying it's a reversionary interest. He says sort of in a general way the reversionary interest was used all these years. It gave the republic flexibility. And what I'm saying is that was never used. The reversionary interest was never used by the republic over the last 30 years of the life of these bonds. So your definition of use is it has to be an exercise? You actually have to use it, correct. And here the Fifth Circuit cases are helpful because they also say- So a right can't be being used sort of passively in order to change somebody's behavior or incentivize a party to act in a certain way or not act in a certain way? But then the question was what was this reversionary interest incentivizing or doing? See, all it was there was just saying when all this is over, the money goes back. If there's anything extra, it's going to go to the central bank reserves, which is where this all started. And in the Connecticut Bank of Commerce case, they say you've got a distinct use as a requirement. It's not enough that something is integral to or related to because that's what the plaintiffs are saying. Much like my adversaries are here in that case. They say, well, the Congo's right to receive royalty payments. That's integral to this whole joint venture relationship. And the court said that's not the test. The 1610A doesn't say integral to or related to. It says used for commercial activity in the United States. So when we train on what everyone has insisted, was there one shred that they could attach? The reversionary interest, it hasn't been used over the life, and to the extent now it comes into play, it's in the context of funds being directed back to the central bank as part, and really it's the culmination of a program adopted in the late 80s after the first modern wave of debt collapses in the developing world, where we in the United States said these folks have insufficient reserves. It's not good for them. It's not good for us. We're going to help them. And so this is going back to the reserve position of the central bank. And I would just make one last point. I take my times off. On the DMK collateral, again, the continual use argument fails twice, because the point there is you still have to be used for commercial activity in the United States. And there, of course, during the life of these bonds, when they say the reversionary interest was important to flexibility, et cetera, that was all in the context of originally Deutsche Mark and then Euro-denominated instruments that couldn't be registered in the United States, that couldn't be sold in the United States, that were purely a European affair with the collateral sitting at the Bundesbank in Germany. Well, if we accept your friend's continuous use argument, then it wouldn't matter whether it's Deutsche Marks in Germany or dollars in New York, right? I think it would, because I don't think, again, the situs argument — Because the activity would be in the U.S. still. The what? Assuming we accept the argument, it would be commercial activity in the U.S. that's independent of where the collateral is sitting. I would disagree with that, Your Honor, because with the DMK bonds, again, we have to go back to — there's the APCO case, which talks about situs, and we all agree that the situs analysis is different from where is the use for a commercial activity analysis. And, again, the right that we have the ability to — Argentina to have funds at the end of the day go to the BCRA. And, again, in the DMK documents, that's all over in Europe as well. It can't be that the fact that the Federal Reserve Bank is the one you send the notice to means that's commercial activity in the United States. I have one final question, which I forgot to ask at the beginning about sealing. I understood the original — I mean, I guess we were able to have the argument today. I understood the original rationale to be that there were settlement negotiations. This was 30-some years ago. And I guess possibly also the possibility of other creditors coming in. Are those still rationales that apply today? We did have settlement discussions. We haven't had them recently, but that, as Your Honor said, was part of the rationale. Well, ongoing conversations is one thing, and then having had them in the past is another thing. Right, so they're not right now going on. Thank you, Your Honor. Thank you both. We'll take the case under advisory.